527 P.2d 104

**In the Matter of the Appeal in PIMA COUN-TY, JUVENILE ACTION NO. J–218–I.**

**No. 2 CA–CIV 1682.**

Court of Appeals of Arizona,
Division 2.

Oct. 17, 1974.

Review Denied Dec. 3, 1974.

Albert R. Gamble, Tucson, for appellant.

Dennis DeConcini, Pima County Atty. by Michael P. Callahan, Deputy County Atty., Tucson, for appellee.

### OPINION

KRUCKER, Judge.

A juvenile court order granting the State's petition to transfer the subject juvenile to adult court for prosecution is the subject of this appeal. The juvenile's attack on the ruling is two-pronged: (1) Rule 14, Rules of Procedure for Juvenile Court, 17A, A.R.S., is violative of the Fourteenth Amendment of the United States Constitution, and (2) The transfer order is unsupported by the evidence.

The challenge to the constitutional validity of Rule 14 need not be discussed since the Arizona Supreme Court has already considered a like argument and rejected it. State v. Lemon, 110 Ariz. 568, 521 P.2d 1000 (1974). Furthermore, the record reflects no departure from the standards enunciated in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L. Ed.2d 84 (1966), and approved by the Arizona Supreme Court in State v. Yard, 109 Ariz. 198, 507 P.2d 123 (1973) as to the determinative factors which should be considered by the juvenile court judge in deciding whether or not to waive jurisdiction. It also argued that no sufficient standards are provided by the phrase "not amenable" and therefore there is a possibility of juvenile judges abusing their discretion. This same contention was advanced in L. v. Superior Court of Los Angeles County, 7 Cal.3d 592, 102 Cal.Rptr. 850, 498 P.2d 1098 (1972). The California Supreme Court rejected it and we believe the following statement is apropos:

".  .  . Since proper operation of the Juvenile Court Law is predicated on treating each minor as an individual [citation omitted] any attempt to explicate the standards with greater particularity appears not merely unnecessary but undesirable as likely to set up mechanical categories which the spirit of the law forbids." 102 Cal.Rptr. at 856, 498 P.2d at 1104.

Rule 14(b), Rules of Procedure for Juvenile Court, provides:

"The court may transfer the action for criminal prosecution to the appropriate court having jurisdiction of the offense if the court finds probable cause and resonable grounds to believe that:

(1) The child is not amenable to treatment or rehabilitation as a delinquent child through available facilities: and

(2) The child is not commitable to an institution for mentally deficient, men-

tally defective or mentally ill persons; and

(3) The safety or interest of the public requires that the child be transferred for criminal prosecution."

Subsection (c) of Rule 14 requires the juvenile court to state the reasons for transfer. The court did make the requisite findings and the juvenile's sole quarrel appears to be with the finding of probable cause and reasonable grounds to believe that he was not amenable to treatment or rehabilitation as a delinquent child through available facilities. The court did set forth the reasons for ordering him to be tried as an adult, which included the following:

1. The juvenile had been referred to Juvenile Court nine times from 1971 to 1974. The basis for these referrals included burglary, auto theft, strongarm robbery, incorrigibility, shoplifting, and runaway. In 1972 he had been placed at the Arizona Youth Ranch and in 1973 at the Averett Westmoreland Youth Home and ran away from each facility less than a month after his arrival.

2. The juvenile was principally involved in a beating of one W. Kurt Kremers; he and another minor had beaten, kicked and stomped the victim to a comatose state; both minors loaded the victim into the back seat of his automobile, transported him to a desert area where he was then beaten to death; the subject juvenile returned about two and a half hours later to the location of the victim's body, poured gasoline over it and set it afire; and the victim was so badly beaten that his skull was broken into moveable segments.

3. The juvenile was in need of lengthy institutionalization in a setting which would provide maximum physical security for the public and the juvenile facilities available to the juvenile court and the Department of Corrections did not have long-term maximum security capabilities.

4. The juvenile had been acknowledged by his stepmother to be beyond her ability to control and supervise and other foster home placements had proven equally unsuccessful.

5. The juvenile had refused to attend schools as a consequence of which he had been removed from schools by action of school authorities.

6. The reports of two psychiatrists indicated that any placement, to give any possibility of success whatsoever, would have to have elements of security not available through existing juvenile facilities.

7. The uncertainty of the acceptance of the juvenile or his retention by some out-of-state juvenile facilities which contract with the Arizona Department of Corrections made a suggestion of placement in such facilities a mere possibility. Consequently, such facilities were not available within the meaning of Rule 14 since their availability was subject to several contingencies, and, if a placement did occur, it was subject to termination at will by the out-of-state authorities.

The subject minor was almost 16 years of age at the time of the hearing below. Since his commitment to the Department of Corrections could not extend beyond his twenty-first birthday, A.R.S. § 8–246(B), the potential time available for rehabilitative attempts was a little more than five years. Psychiatric opinion was unanimous that he required confinement to a structured program in a closed facility. According to one psychiatrist:

". . . In view of this extensive past record, the prognosis with regard to the treatment and rehabilitation is guarded. It is my professional opinion that treatment could only possibly be successful if the defendant were confined to a structured treatment program in a closed facility for a minimum of one year."

Appellant counsel places much reliance upon the opinion of another psychiatrist

that the juvenile was amenable to treatment and rehabilitation. This psychiatrist recommended "psychotherapy on a behavioral basis" and "in a place that also has security." On cross-examination the psychiatrist indicated that his "amenability" opinion was somewhat predicated upon his consideration of the alternative. He testified:

"Q. Will you please tell us specifically in the behavioral therapy what you contemplate, in other words, if you had a facility and he came and you knew these things about him you would sit down to do what?

A. I would sit down first to understand him. I would try to make friends with him. I would observe him. I would find out what makes—what motivates [juvenile]. What he likes to do. You're asking me for treatment, how I'd go about it. Okay.

I would find out what motivates the young man. I would set up certain goals that—with rewards and punishments which had worked and in this way after an observable period of time we hopefully hope—there is always hope that he will change; just like to remind you what is the alternative.

Q. Doctor, we're not—we're not concerned with the alternative or with the social defects in the penal system at this stage and we are concerned with whether or not existing juvenile facilities will be allowed to do something with [juvenile] if he is not out killing people."

\*     \*     \*     \*     \*     \*

"A. Unfortunately, I don't think there are too many places in Arizona, that would fit [juvenile's] problem. However, there are some in California and I understand that the State of Arizona has some kind of a working agreement with them. It certainly should be explored.

Q. Again, you are considering the alternatives when you say that, aren't you?

A. Alternatives of course I always consider the alternatives. I hope that you do too. I hope you are considering that justice is not just punishment. That it is also consistent with rehabilitation and a few other things and both you and I are in agreement as to that. We want to do the best we can for the young man and also serve justice at the same time."

The doctor admitted that the juvenile needed a security facility which was unavailable in Arizona. He testified:

"[Juvenile] has a habit of running away when things don't suit him. This condition should be guarded against and it can be eradicated with behavioral therapy. It is a difficult problem. It is not easy. But I think that just because it is difficult, that doesn't mean that we shouldn't try it because the alternative is just to me unthinkable at his age.

Q. The alternative meaning Arizona State Prison?

A. Yes. It would foster a lot of unnatural sexual habits. There is very little training there, unfortunately."

The hearing officer for the Department of Corrections testified that if the juvenile was committed to the Department of Corrections, a "long-term placement" would be necessary, also, that comparing what the State of Arizona vis-a-vis the State of California had to offer in the way of facilities, only the California facilities would have the best chance of working with the juvenile. When asked whether he felt that nothing could be accomplished in Arizona, he responded:

"A. Basically, we would be removing him from society. Hopefully, in that time we could work with some problems. I am not sure exactly what progress we could make, but we would not try to give up on anybody.

"Q. Well, if you had to say yes or no about progress, which would you say?

"A. I would say the chances are we wouldn't make too much progress with [juvenile]."

This witness testified that in order for the out-of-state facilities to be made available for the juvenile, he would have to be committed to the Department of Corrections before attempts at diagnosis by the California facilities could be undertaken.

A counselor at the juvenile court detention center expressed his opinion that the juvenile was not amenable under the juvenile system because of his age, the number of years he had been in contact with the juvenile court system and the prior failures to help him in the system.

Thus we see that there was unanimity of opinion that no facilities existed within the State of Arizona which could provide the services necessary for the rehabilitation process. Furthermore, although there was evidence of the *existence* of potentially suitable California facilities, whether or not the subject juvenile would be accepted and confined therein for the requisite treatment period was a matter of conjecture.

Furthermore, in order for these out-of-state facilities to be even potentially available, the juvenile would have to be adjudicated a delinquent and committed to the Department of Corrections. Under these circumstances, subsequent prosecution as an adult would be foreclosed. Coleman v. Superior Court in and for County of Pima, 110 Ariz. 386, 519 P.2d 851 (1974). Should the California facilities decline to accept the juvenile for treatment or, after accepting him, decide they were unable to work with him and return him to the Arizona Department of Corrections, the Arizona facilities would provide neither the maximum security nor the behavioral psychotherapy needed. We believe the following statement of Division One of this court in the case of Maricopa County, Juvenile Action No. J–72804, 18 Ariz.App. 560, 504 P.2d 501 (1972) aptly expresses our view:

"Admittedly, the court in order to adequately inform itself as to all aspects of the behavioral sciences as they specifically apply to a juvenile, should consider and be receptive to experts in this field.

However, when we consider the nature of this testimony—the attempt to predict human behavior in a particular individual over a definite period of time—the juvenile court should not be limited solely to such opinion evidence. Rather, the juvenile judge should also properly consider the particular juvenile's track record in the past and his amenability to the juvenile processes that this record discloses. When considered in this light, and considering the expert's opinion that a controlled environment was necessary and the 'iffy' availability of such environment, we cannot say that there was insufficient evidence to support the juvenile court's finding that the appellant was not amenable to treatment as a juvenile." 18 Ariz.App. at 563–564, 504 P.2d at 504.

 We find no abuse of the juvenile court's discretion in finding that this juvenile was not amenable to rehabilitation through available facilities.

The transfer order is affirmed.

HATHAWAY, C. J., and HOWARD, J., concur.